

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**White Apple iPhone**<br>**Seized as FP&F No. 2023565300061601**<br>**("Target Device 2")** | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No.   **23mj2419-BLM** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the      Southern      District of      California      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324     Alien Smuggling | |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:     07/05/2023

*Judge's signature*

City and state:   San Diego, California

HON. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The following property is to be searched:

White Apple iPhone
Seized as FP&F No. 2023565300061601
(**"Target Device 2"**)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

13

**ATTACHMENT B**

ITEM TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2 and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 5, 2023, through July 5, 2023**:

a.    tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

15

## AFFIDAVIT

I, Shawna M. Wilson, being duly sworn, hereby state as follows:

## INTRODUCTION

1.     I submit this affidavit in support of an application for warrants to search the following electronic devices:

Black Apple iPhone
Seized as FP&F No. 2023565300061601
(**"Target Device 1"**)

White Apple iPhone
Seized as FP&F No. 2023565300061601
(**"Target Device 2"**)

White Apple iPhone
Seized as FP&F No. 2023565300061602
(**"Target Device 3"**)

the **"Target Devices"**, as further described in Attachment A-1, A-2, A-3, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.     The requested warrant related to the investigation and prosecution of James Jake HARRISON and Nial Monty COLEMAN for transporting and moving illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of the investigation into this matter.   Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

1  in concert with other individuals and to do so by utilizing cellular telephones to maintain
2  communications with co-conspirators and/or illegal aliens in order to further their criminal
3  activities. Because they are mobile, the use of cellular telephones permits alien smugglers
   and transporters to easily carry out various tasks related to their smuggling activities,
4  including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit,
5  providing instructions to transporters, guiding aliens to specific pick up locations, warning
   accomplices about law enforcement activity in the area and the status of check-point
6  operations, and communicating with co-conspirators who guide aliens, coordinate drop off
7  locations, and/or operate alien stash houses.

8         8.    The smuggling of aliens generates many types of evidence, including, but not
   limited to, cellular phone-related evidence such as voicemail messages referring to the
9  arrangements of travel, names, photographs, text messaging (via SMS or other
10 applications), and phone numbers of co-conspirators and illegal aliens. For example,
   drivers and passengers responsible for transporting illegal aliens are typically in telephonic
11 contact with co-conspirators immediately prior to and/or following the crossing of the
12 illegal aliens at the border, at which time they receive instructions, including where to pick-
13 up the illegal aliens for transportation into the United States and where to take the illegal
   aliens after crossing into the United States. These communications may also include
14 locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in
15 telephonic contact with co-conspirators prior to and following their crossing in order to
16 make smuggling arrangements, receive instructions, and report their locations after
17 crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to
   months in advance of an event to recruit drivers and to coordinate the event. It is also
18 common for co-conspirators to continue to contact each other by phone calls, social media,
19 or messaging applications when contact is lost with the driver after an apprehension has
20 occurred.

21

9.     Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.    On July 2, 2023, Border Patrol Agent D. Torres was performing his assigned duties in the Brown Field Stations area of responsibility. Agent Torres was operating a fully marked Border Patrol vehicle and dressed in full rough duty attire. At approximately 3:40 AM, National Guard scope operator relayed via service radio, a group of four individuals were running toward a parked sedan located at what is known to Border Patrol Agents as "Patty's Pullout," on Cochera Via Road. Agent Torres arrived at State Route 94 (SR94) and Cochera Via Road when he observed a black Dodge Charger with a Nevada License plate (target vehicle) turn onto SR94 in a westbound direction. Agent Torres activated his emergency equipment in an attempt to pull the target vehicle over. The vehicle accelerated and Agent Torres relayed a failure to yield via his service radio. Agent Torres witnessed the target vehicle lose some control and jerking as it veered towards the north shoulder of SR94.

12.    At approximately 3:45 AM, Supervisory Border Patrol Agent M. Owens began to set up a vehicle immobilization device (VID) at the SR94 Border Patrol Checkpoint. Agent Owens advised agents the VID was set up and for agents to block the eastbound lanes west of the checkpoint. At this time (A)Watch Commander R. Garcia instructed Agent Torres to terminate the pursuit, Agent Torres acknowledged. At approximately 3:50 AM, the target vehicle approached the checkpoint at a high rate of speed and ran over the VID, impacting all four tires.

13.    At approximately 3:51 AM, Border Patrol Agent C. Copenhaver stated that the target vehicle passed his location at Otay Lakes Road and continued westbound on SR94. Agent Copenhaver observed the target vehicle began to lose control and slow down approximately one quarter mile east of call box 234 along SR94.

14.    At approximately 3:53 AM, Border Patrol Agent A. Cifuentes, utilizing a thermal scope, observed three individuals running toward a creek near where the target vehicle came to a stop. Agent Cifuentes relayed this information via service radio and Agent Cifuentes guided agents to the last known location which he observed them.

15.    Agent Copenhaver approached the target vehicle and observed two individuals running from the vehicle into the brush on the side of the road. Agent Copenhaver approached the target vehicle and observed three individuals sitting in the back seat. Agent Copenhaver identified himself as a United States Border Patrol Agent and ordered them not to move and show him their hands. Agent Copenhaver conducted an immigration inspection and all three subjects, later identified as Francisco Javier RODRIGUEZ-Gordillo, Brandon Dilan NAVARRETE Martinez, and Joel AKE-Huchim, individually stated they were citizens of Mexico not in possession of proper immigration documentation allowing them to enter or remain legally. At approximately 4:00 AM, Agent Copenhaver placed all three individuals under arrest. This area is approximately 6.75 miles east of the Otay Mesa, California, Port of Entry and approximately 8.0 miles north of the international boundary.

16.    Simultaneously, Border Patrol Agent J. Wynglarz arrived on scene and was guided in the direction Agent Cifuentes had last visual conformation of two other individuals. Agent Wynglarz deployed his canine partner and began to follow an odor. Agent followed his canine partner until he encountered two individuals attempting to conceal themselves in the brush, later identified as Guillermo MEZA Gaona and Juan Mario RIOS Vejar. Agent Wynglarz identified himself as a United States Border Patrol Agent and conducted an immigration inspection. Both individuals admitted to being citizens of Mexico without proper documentation allowing them to enter or remain in the United States legally. At approximately 4:20 AM, Agent Wynglarz placed MEZA and RIOS under arrest.

1

2

3

4

5

6

7

8

17.     Agent Wynglarz was guided by Agent Cifuentes toward another location where he lost sight of another individual. Agent Wynglarz again deployed his canine partner and followed him until encountering one individual laying behind a bush, later identified as James Jake HARRISON. Agent Wynglarz identified himself as a United States Border Patrol Agent and ordered HARRISON not to move. Agent Wynglarz asked HARRISON if he had any weapons and HARRISON responded, "no, I don't use weapons. Agent Wynglarz asked HARRISON why he didn't have on shoes, HARRISON responded, "I didn't have shoes, I wore flip flops, and I left them in the car." Agent Wynglarz placed handcuffs on HARRISON and advised him that he was being detained for suspicion of 8 USC 1324, alien smuggling. It was that time HARRISON stated, "Ill never do this again, I did it for my kids, I learned my lesson, its my first time."

9

10

11

12

13

14

15

16

17

18

18.     Agent Wynglarz walked HARRISON back to the target vehicle, his canine partner alerted and began following an odor. Agent Wynglarz encountered another individual, later identified as Nial Monty COLEMAN, was concealed in heavy vegetation within approximately 10 feet of the target vehicle at the time of arrest. COLEMAN was arrested wearing a light grey and white sweatshirt with a hood. A material witness stated that he couldn't see the driver and passenger of the target vehicle because they both wore sweatshirts with hoods, but the passenger stood out because he wore a white sweat shirt with a hood. Agent Wynglarz identified himself to COLEMAN as a United States Border Patrol Agent and ordered him to show his hands. COLEMAN stated, "what's going on man, I'm trying to sleep." Agent Wynglarz advised COLEMAN that he was being detained for Alien Smuggling. Agent found a pair of flip flops on the driver side floorboard in the target vehicle. At approximately 4:30, Agent Wynglarz placed HARRISON under arrest and at approximately 4:55 AM, Agent Wynglarz placed COLEMAN under arrest.

19

20

21

19.     At the time of arrest, a black Apple iPhone **(Target Device 1)** was found under the driver's floor mat. A white Apple iPhone **(Target Device 2)** was found laying next to HARRISON. Another white Apple iPhone was found in the pocket of COLEMAN.

7

HARRISON claimed ownership of two cell phones (**Target Device 1 and 2**). COLEMAN claimed ownership of one cell phone (**Target Device 3**). These devices were subsequently seized.

20.     Defendant HARRISON was read his Miranda Rights and stated that he understood his rights and was willing to speak without an attorney present. HARRISON stated he met a guy at a "takeover" on Manchester and Dekar. HARRISON stated he was going to be paid one thousand dollars. HARRISON claimed ownership of the target vehicle but is not registered in his name because he claims to have just purchased it. HARRISON was asked how he ended up in San Diego and HARRISON stated, "I prefer to stop answering questions and have my attorney present."

21.     Material Witnesses Guillermo MEZA Gaona, Brandon Dilan NAVARRETE Martinez and Juan Mario RIOS Vejar stated they are citizens of Mexico without any immigration documents allowing them to enter or remain in the United States legally. MEZA and RIOS claim their smuggling arrangements were made by their families and both were heading to Los Angeles, California. NAVARRETE claims he made his smuggling arrangements by contacting a coyote and paid $7,000 USD to be smuggled to San Diego, California. All three Material Witnesses claimed a foot guide took them to the pickup location and described the type and color of the vehicle that was supposed to pick them up, then fled. They were told a dark colored dodge challenger or charger. RIOS claims he was able to identify the target vehicle when it arrived because the area was desolate and there were no other vehicles. NAVARRETE claims they couldn't see the drivers because they both wore sweatshirts with hoods, but the passenger stood out because he wore a white sweatshirt with a hood.

22.     Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

8

electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**.

23.    In light of the above facts and my experience and training, there is probable cause to believe that the defendants, were using the **Target Devices** to communicate with others to further illegal entry into the United States.  Based on my training and experience, it is also not unusual for individuals, such as the defendant, to attempt to minimize the amount of time he was involved in smuggling activities, and for the individual to be involved for weeks and months longer than he claims. Accordingly, I request permission to search the **Target Devices** for data beginning on **June 5, 2023, through July 5, 2023**.

## METHODOLOGY

24.    It is not possible to determine, merely by knowing the cellular telephones' make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.

25.    Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data

acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26.     Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

27.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date this warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

28.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

29.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

30.     Because the **Target Devices** were seized at the time of the defendant's arrest; and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **June 3, 2023, through July 3, 2023**.

31.     Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1, A-2 and A-3 seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 5th day of July 2023.

Hon. BARBARA L. MAJOR
United States Magistrate Judge

11